# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Detention of:<br>A.P., | No. 53745-1-II |
| STATE OF WASHINGTON, | |
| Respondent, | UNPUBLISHED OPINION |
| v. | |
| A.P., | |
| Appellant. | |

SUTTON, A.C.J. — AP appeals from an order extending his detention for involuntary mental health treatment under a less restrictive alternative (LRA). He argues that the evidence was insufficient to establish that he was gravely disabled. We disagree, and affirm.[1]

### FACTS

AP has a long history of mental health issues and has been diagnosed with schizoaffective disorder, bipolar type. In 2016, the court ordered an LRA[2] and AP began residing at Gibraltar Senior Living. The LRA order was extended several times prior to June 2019.

---

[1]We note that although the 180-day extension of the LRA order has expired, this case is not moot because prior commitments have potential collateral consequences. *In re Det. of M.K.*, 168 Wn. App. 621, 629, 279 P.3d 897 (2012).

[2] There is no information in the record regarding whether AP was placed in an LRA after a period of involuntary inpatient treatment.

On June 28, 2019, AP's providers petitioned to extend the LRA order for an additional 180 days, alleging that AP continued to be gravely disabled as a result of a mental disorder. Audrey Osborne, a Pierce County designated crisis responder, was the sole witness at the hearing on the petition.

Osborne testified that AP had been diagnosed with schizoaffective disorder, bipolar type, and that she had interviewed the then 59-year-old AP four times over the previous two years while he was living at Gibraltar, a structured senior living facility. Osborne did not have any information about AP's "prior inpatient detentions." Clerk's Papers (CP) at 78-79.

Osborne testified that AP was receiving disability[3] income through the Veteran's Administration (VA) due to a psychiatric condition and that he was currently receiving treatment through the VA. She stated that AP had been "doing well" and had "stabilized" under the current LRA order and that he had been generally compliant with the medication and treatment orders over the past year and a half. CP at 72.

Osborne testified, however, that although AP was aware that he was receiving VA disability based on a mental health condition, AP continued to assert that he did not have a mental illness and that he did not need to take any psychiatric medication. Osborne further testified that AP did not want to continue taking his medication. She also stated that due to AP's lack of insight into his mental illness and need for psychiatric medications, if AP were not subject to an LRA order, he would stop taking his medication and "his ability to function would be compromised" significantly within days. CP at 78.

---

[3] Osborne testified that AP was receiving a "100 [percent] service-connected disabled vet[eran]" pension as well as Social Security. CP at 72.

Osborne commented that because of his success while under on the LRA order, it would be in AP's best interest to remain in a supported environment and that AP would quickly become gravely disabled "if he were not receiving treatment." CP at 77. She noted that "in the past, it has been observed that when he stops his medication, then within days, his behavior changes and he is difficult to manage." CP at 78. Osborne testified that it would be unlikely that AP would be able to remain at Gibraltar if he discontinued his medication. And she opined that the housing, stability, treatment plan, and medications the LRA order offered had significantly stabilized AP.

After hearing Osborne's testimony and argument, the commissioner issued the following oral ruling:

> The difficulty that this court has -- I think that there is clear, cogent and convincing evidence to keep [AP] on the LRA. He's doing well, but the testimony that I have is, although he isn't hasn't [sic] shown a pattern of decompensating, because he abides by court orders, and that's what has kept him from going down that road. *He's made it clear*, and I think to . . . Ms. Osborne, as well as to other parties, *that he intends to not stay on his medication*, and has different ideas, should this order not be in effect. I think it's great that he has done as well as he has; I think that it's great that he's goal oriented. *I think the risk of decompensation in this case is enough for me to issue this order*. I also note that we have buy-in from his guardian of the [e]state, who also has expressed, it appears, support of the continued LRA. Now. That having been said, if there were a motion to somehow change the conditions of the LRA, or if his plan to move to Alabama ever came to fruition and there was a stable place there that he could abide by, obviously that would leave Washington, but it's not unheard of for cases to get transferred to another state -- that would not bar him from pursuing what he wants to pursue in Alabama. There would need to be more concrete plans to that effect for that to happen.

CP at 87 (emphasis added).

The court then issued the following written findings of fact:

3

> **[AP's] current Mental Status Examination reveals:**
>
> Good memory for remote and current events. He appears stabilized. His thought process is clear and oriented. He takes good care of himself and believes that "moving to Alabama" would be in his best interest. He is not delusional but he also is not practical. ([F]or example he wants to leave the state, start law school, get a girlfriend, and stop all medication). He also states he is younger than he really is because he had transfusions from younger people so that transfers him to a younger age. *Insight limited in that he does not think he has a mental illness and does not think he needs medication.* However he understands he has a mental disability which is the source of his VA benefits. Good volitional control. *Ms. Osborne notes that he would be [gravely disabled] if he failed to take medication and decompensated.*
>
> **Further, based on the verified Petition and the testimony of Petitioner, the Respondent:**
>
> Audrey Osbourne [sic] testified. [She] reviewed all records and spoke with his case-manager. She has seen [AP] on [four] occasions over the last few years a[t] Gibraltar House. [AP] has a guardian of the estate that helps manage his funds. The guardian believes the LRA is a benefit that includes living at the Gibraltar House. [*AP*] *has been compliant with medications and treatment, which has allowed him to make the progress he has made over time. Without the structure and housing per the current LRA, he would likely decompensate.*
>
> [Osborne] believes [AP] tends to obey the law so he likely will abide by the LRA [o]rder. *If it is not entered he likely will cease medications and treatment.*
>
> Cross: [AP] was fully oriented. He is friendly and cooperative. He is able to go into the community and he does well. He always returns to the Gibraltar House. His thought process is reasonable organized, he is goal oriented. He has VA income at $3000 and additional from Social Security.

CP at 58-59. The commissioner also found that AP "has only had a few prior [involuntary treatment commitments]," noting that AP had primarily "worked . . . with the VA for treatment for long term mental health issues." CP at 58.

The commissioner ultimately found that, "[a]s a result of a mental disorder, [AP] . . . manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of

cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety." CP at 59 (boldface omitted). The commissioner concluded that "[a]s a result of a mental disorder, [AP] shall be detained for involuntary inpatient treatment or shall be treated under [LRAs] with conditions as set in the separate [o]rder [d]etaining [r]espondent." CP at 58. The commissioner further concluded that AP is or continued to be gravely disabled and that a continued LRA order was in his best interest. The commissioner also adopted her oral findings of fact and conclusions of law. Based on these facts, the commissioner granted the petition and continued the LRA order for 180 days.

The commissioner ordered that AP remain at Gibraltar until discharged under the LRA order and that he participate in the recommended mental health treatment and take all prescribed medications. The commissioner also ordered that AP not leave the state "unless a residence and ongoing [treatment] in or at a VA facility is authorized in Alabama, and guardian is able to transfer funds to support [AP]." CP at 62.

AP moved to revise the commissioner's decision, arguing that there was insufficient evidence to find that AP was presently gravely disabled. Noting AP's current success while under the LRA order, the superior court discussed whether the court was required to release AP to allow him to decompensate before it could extend the LRA.

The superior court then stated,

> And I -- I don't think that I'm required to risk his life by saying[,] "It's okay you don't want to take your meds. You have unrealistic goals. You have no real planning other than you just want to get out of this group home or family home. And I'm going to risk that you're going to be okay in the future.

5

I find by clear, cogent, and convincing evidence that this gentleman is doing as well as he is doing because of the structured environment that he is currently in. And he is doing exactly what the statute intended for him to do, and that was to have an environment that supported him and his mental health.

And he's doing extremely well, but *the problem is he's been vocal about the fact that he doesn't want to take meds, he's not going to take meds if he's released.* He has unrealistic planning. *He has little or no insight into his condition.* If he is still talking about -- And this has been his theme for the last year and a half, according to Ms. Osborne, is that he wants to go to Alabama and go to law school, which the [c]ourt has to find is simply not realistic.

And . . . *I find by clear, cogent, and convincing evidence that he will not receive the care if he was released without less restrictive conditions.* And if he wants to realistically plan for a release from somewhere other than where he wants to be currently, the [c]ourt would be all ears. But *I feel by clear, cogent, and convincing evidence that if he was released without any support structure and left on his own to voluntarily make these decisions -- I think he's gravely disabled in that respect and we would be exactly doing what the State is not wanting to do, and that's create a revolving door for this gentleman.*

And I understand, [AP's counsel], your argument 1,000 percent, because I made it many times myself. *But I just feel until he gets more insight into the fact that he needs medication and he needs [a] more realistic plan for his future that I still find that to be the definition of "gravely disabled" and respectfully deny your motion to revise.* I think the commissioner made the right decision.

Verbatim Report of Proceedings (VRP) (Aug. 2, 2019) at 14-15 (emphasis added). The superior court issued an order denying the motion for revision and adopting the commissioner's decision.

AP appeals the extension of his LRA.

ANALYSIS

AP argues that the gravely disabled finding is not supported by substantial evidence because the court found that he was "gravely disabled based on the *future* possibility that he could become gravely disabled if taken of[f] the LRA," rather than "recent, tangible evidence of failure

or inability to provide for [his] essential human needs." Br. of Appellant at 1 (emphasis added). We disagree.

## I. LEGAL PRINCIPLES

"On appeal [following a denial of a motion to revise a commissioner's ruling], this court reviews the superior court's ruling, not the commissioner's." *Maldonado v. Maldonado*, 197 Wn. App. 779, 789, 391 P.3d 546 (2017) (citing *In re Marriage of Stewart*, 133 Wn. App. 545, 550, 137 P.3d 25 (2006)). Because the superior court denied AP's motion to revise the commissioner's ruling, the commissioner's decision becomes the superior court's decision. *Maldonado*, 197 Wn. App. at 789 (citing *In re Marriage of Williams*, 156 Wn. App. 22, 27-28, 232 P.3d 573 (2010)).

In the context of an extension of an LRA order, the petitioners must prove that the respondent "[c]ontinues to be gravely disabled." RCW 71.05.320(4)(d).[4] The grave disability must be shown by clear, cogent, and convincing evidence, meaning that the ultimate fact in issue is shown to be "highly probable." *In re Det. of LaBelle*, 107 Wn.2d 196, 209, 728 P.2d 138 (1986).

We "will not disturb the trial court's findings of 'grave disability' if [the findings are] supported by substantial evidence which the [superior] court could reasonably have found to be clear, cogent[,] and convincing." *LaBelle*, 107 Wn.2d at 209. "'Substantial evidence is evidence that is in sufficient quantum to persuade a fair-minded person of the truth of the declared premise.'" *In re Det. of T.C.*, 11 Wn. App. 2d 51, 56, 450 P.3d 1230 (2019) (internal quotation omitted) (quoting *In re Det. of A.S.*, 91 Wn. App. 146, 162, 955 P.2d 836 (1998)).

---

[4] The legislature amended this statute in 2020, but subsection (4)(d) did not change. Laws of 2020, ch. 302 § 45. Accordingly, we cite to the current version of the statute.

## II. GRAVELY DISABLED

An individual may be involuntarily committed for mental health treatment if, as a result of a mental disorder,[5] the individual is gravely disabled. *LaBelle*, 107 Wn.2d at 201-202. At the time the petition was filed in this case, former RCW 71.05.020(22) (2018)[6] provided two definitions of "gravely disabled." The superior court relied on the definition in former RCW 71.05.020(22)(b), which required the petitioners to prove that AP "manifest[ed] severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety." The petitioners must establish that the individual is gravely disabled by clear, cogent, and convincing evidence. *LaBelle*, 107 Wn.2d at 209.

Subsection (22)(b) was intended to address respondents who experience "'decompensation.'" *LaBelle*, 107 Wn.2d at 206. This subsection

> permits the State to treat involuntarily those discharged patients who, after a period of time in the community, drop out of therapy or stop taking their prescribed medication and exhibit "rapid deterioration in their ability to function independently,"

without requiring those individuals to decompensate to the point that they were in danger of serious harm from their inability to care for themselves. *LaBelle*, 107 Wn.2d at 206 (quoting Durham & LaFond, *The Empirical Consequences and Policy Implications of Broadening the Statutory Criteria for Civil Commitment*, 3 Yale L. & Pol'y Rev. 395 (1985)).

---

[5] AP does not dispute that any potential grave disability was the result of a mental disorder.

[6] LAWS OF 2018, ch. 201 § 3001.

The "evidence must include recent proof of significant loss of cognitive or volitional control. In addition, the evidence must reveal a factual basis for concluding that the individual is not receiving *or would not receive, if released*, such care as is essential for his or her health or safety." *LaBelle*, 107 Wn.2d at 208 (emphasis added). The care must be essential to the respondent's health or safety, not merely preferred, beneficial, or in his best interest. *LaBelle*, 107 Wn.2d at 208.

Additionally,

> [i]mplicit in the definition of gravely disabled . . . is a requirement that the individual is *unable*, because of severe deterioration of mental functioning, *to make a rational decision with respect to his need for treatment*. This requirement is necessary to ensure that a causal nexus exists between proof of "severe deterioration in routine functioning" and proof that the person so affected "is not receiving such care as is essential for his or her health or safety".

*LaBelle*, 107 Wn. 2d at 208 (some emphasis added, internal quotation marks omitted). A key component in this analysis is whether the respondent is able to "form realistic plans for taking care of himself outside the hospital setting." *LaBelle*, 107 Wn.2d at 210.

AP argues that there had to be evidence that he was unable to provide for his essential needs or make rational decisions regarding his care and that it was mere speculation that he would stop taking his medication and decompensate if he were to be released from the LRA order.[7] But Osborne testified that AP wanted to stop taking his medication and that if AP were not subject to

---

[7] AP also argues that, as in *In re Detention of M.K.*, 168 Wn. App. 621, 279 P.3d 897 (2012), there was no evidence establishing that AP "would not be able to provide for his essential health care and safety." Br. of Appellant at 13. But, AP relies on the unpublished portion of *M.K.* Because *M.K.* was filed in 2012, well before March 1, 2013, not only is the unpublished portion of *M.K.* not binding authority, this court cannot consider the unpublished portion of the opinion as persuasive authority. GR 14.1(a). Accordingly, we do not consider this portion of *M.K.*

an LRA order, he would likely stop taking his medication because he lacked insight into his mental health condition and did not believe he needed medication.

Osborne also testified that because of AP's lack of insight into his mental health condition and his need for medication, an LRA order was necessary to ensure he remained compliant. She stated that past experience demonstrated that if he stopped taking his medication he would quickly decompensate and that his continued housing at Gibraltar would be put at risk.

This evidence provides clear, cogent, and convincing evidence that AP was incapable of making rational decisions related to his treatment and that he would decompensate quickly if released from the LRA order. Thus, there is substantial evidence supporting the gravely disabled finding.[8] *See LaBelle*, 107 Wn. 2d at 208 ("Implicit in the definition of gravely disabled . . . is a requirement that the individual is *unable*, because of severe deterioration of mental functioning, to make a rational decision with respect to his need for treatment.").

AP also contends that there was no testimony providing "any examples of decompensation," when AP was not taking his medication and that it was mere speculation that he would experience decompensation that rendered him gravely disabled. Br. of Appellant at 13. But Osborne testified that in the past AP had stopped taking his medication and that within days his behavior had changed to the point he was "difficult to manage." VRP at 78. Osborne also testified

---

[8] AP also asserts that Osborne "believed that A.P. is gravely disabled not based on present behavior, but rather based on A.P.'s plans to move to Alabama, which she and [the guardian] believed were not 'realistic' or 'practical', despite A.P.'s $3700 month income." Br. of Appellant at 12. Although the nature of AP's proposed release plan was vague and the superior court found it unrealistic, AP's lack of insight into his mental health condition and need for medication, which would place him at risk of decompensation, was alone sufficient to support the grave disability finding.

that in the past AP's behaviors had "been a problem" and had threatened his ability to remain at Gibraltar VRP at 78. This evidence goes beyond mere speculation and supports a finding that it was highly probable that AP would decompensate without being subject to an LRA order.

AP further argues that the court erred by relying on the legislative notes to RCW 71.05.320[9] to support its ruling because RCW 71.05.320 requires "evidence of a recent inpatient civil commitment . . . [and] the state failed to present any such evidence."[10] Br. of Appellant at 15. Although the legislative note to RCW 71.05.320 mentions a recent inpatient civil commitment, RCW 71.05.320 does not state that a prior inpatient civil commitment is required. And AP cites no authority requiring a prior inpatient commitment before the trial court can consider the risk of decompensation when addressing whether to renew an LRA order. Accordingly, this argument fails.

---

[9] The legislative note provides:

> (1) The legislature finds that many persons who are released from involuntary mental health treatment in an inpatient setting would benefit from an order for less restrictive treatment in order to provide the structure and support necessary to facilitate long-term stability and success in the community.
>
> (2) The legislature intends to make it easier to renew orders for less restrictive treatment following a period of inpatient commitment in cases in which a person has been involuntarily committed more than once and is likely to benefit from a renewed order for less restrictive treatment.
>
> (3) The legislature finds that public safety is enhanced when a designated mental health professional is able to file a petition to revoke an order for less restrictive treatment . . . before a person who is the subject of the petition becomes ill enough to present a likelihood of serious harm.

Laws of 2015, ch 250 § 21; Laws of 2009 c 323 § 1.

[10] We note that a footnote in the response cites to various records that might establish a prior involuntary inpatient commitment. Br. of Resp't at 1 fn. 2. But the documents cited are not part of the appellate record, nor were they designated as part of the appellate record.

No. 53745-1-II

Because the gravely disabled finding is supported by substantial evidence, we affirm the order extending the LRA order.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Sutton, A.C.J.

SUTTON, A.C.J.

I concur:

Cruser, J.

CRUSER, J.

MAXA, J. (dissenting) – The record here shows that the superior court erred in entering AP's commitment order because the State failed to show that AP was gravely disabled as defined in former RCW 71.05.020(22)(b) (2018). Accordingly, I dissent.

A person is "gravely disabled" under former RCW 71.05.020(22)(b) if the person "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety." There is no question that this definition has *two separate requirements*: (1) a severe deterioration in routine functioning evidenced by a loss of cognitive or volitional control and (2) a failure to receive treatment that is essential for health or safety. *In re Det. of LaBelle*, 107 Wn.2d 196, 205, 728 P.2d 138 (1986).

Unfortunately, both the State and the courts tend to ignore the first requirement of former RCW 71.05.020(22)(b) and focus only on the second requirement. The commissioner and the superior court did so here, as does the majority. The result is that the first requirement of former RCW 71.05.020(22)(b) has been written out of the statute in this case.

There is no question that the evidence here supports a finding that the State has satisfied the second requirement of former RCW 71.05.020(22)(b). The court in *LaBelle* stated that the State can meet its burden under the second requirement by presenting evidence that the person "would not receive, if released, such care as is essential for his or her health or safety." 107 Wn.2d at 208. Here, the record shows that AP would stop taking his necessary medication if released, which would endanger his health and safety.

But where is the evidence that AP "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her

actions"? Former RCW 71.05.020(22)(b). In *LaBelle*, the court stated that "it is particularly

important that the evidence provide a factual basis for concluding that an individual 'manifests

severe [mental] deterioration in routine functioning'. Such evidence must include recent proof of

significant loss of cognitive or volitional control." 107 Wn.2d at 208 (quoting former RCW

71.05.020(1)(b) (1979)). There was no such evidence here.

The commissioner's factual findings regarding AP's mental state, which the superior

court adopted, are telling:

> Good memory for remote and current events. He appears stabilized. *His thought process is clear and oriented*. He takes good care of himself. . . . Insight limited in that he does not think he has a mental illness and does not think he needs medication. However, he understands he has a mental disability which is the source of his VA benefits. *Good volitional control*.
> . . . .
>
> He was fully oriented. He is friendly and cooperative. He is able to go into the community and he does well. He always returns to the Gibraltar House. His thought process is reasonable organized, he is goal oriented.

Clerk's Papers (CP) at 58-59 (emphasis added). The commissioner's finding that AP had clear

and oriented thought process and good volitional control is inconsistent with the conclusion that

he demonstrated a loss of cognitive or volitional control.

The commissioner further found: "[AP] . . . believes that 'moving to Alabama' would be

in his best interest. *He is not delusional* but he also is not practical. (For example, he wants to

leave the state, start law school, get a girlfriend, and stop all medication)." CP at 58 (emphasis

added). The commissioner apparently did not agree with AP's plan for the future. The superior

court took the same position, stating, "You have unrealistic goals" and "[AP] wants to go to

Alabama and go to law school, which the [c]ourt has to find is simply not realistic." Report of

14

Proceedings (Aug. 2, 2019) at 14. But just because a person has a mental illness does not allow a court to override that person's goals and dreams. And having unrealistic goals does not reflect the "loss of cognitive or volitional control." Former RCW 71.05.020(22)(b).

The commissioner and the superior court apparently believed that it was in AP's best interest to remain involuntarily committed. I do not disagree with that conclusion. But that is not the standard for involuntary commitment. The court in *LaBelle* emphasized that people cannot be involuntarily committed "solely because they are suffering from mental illness and may benefit from treatment." 107 Wn.2d at 207.

The commissioner and the superior court also apparently thought that AP would decompensate if released. That conclusion may be reasonable. But again, that is not the standard for involuntary commitment. Unless the legislature removes the first requirement under former RCW 71.05.020(22)(b), the possibility that a person might decompensate if released is not a sufficient basis to involuntarily commit that person.

There simply is insufficient evidence in the record to establish by clear, cogent, and convincing evidence that AP "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions." Former RCW 71.05.020(22)(b). Therefore, I would reverse AP's involuntary commitment.



MAXA, J.

15